IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC, RELATED TO THE FOLLOWING LOCATIONS, DATES AND TIMES:

ON APRIL 17, 2023; 1850HRS (6:50 P.M.) TO 1925HRS (7:25 P.M.) - EASTERN STANDARD TIME

WITHIN THE FOLLOWING AREA:
NORTHWEST CORNER:
37.77599, -83.68997
(37°46'33.6"N 83°41'23.9"W)

SOUTHWEST CORNER:
37.77039, -83.68679
(37°46'13.4"N 83°41'12.4"W)

SOUTHEAST CORNER:
37.77181, -83.68275
(37°46'18.5" N 83°40'57.9" W)

NORTHEAST CORNER:
37.77556, -83.68174
(37°46'32.0"N 83°40'54.3"W)

**FILED UNDER SEAL**

Case No.

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Kyle McCammon, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a warrant to search information that is stored at premises controlled by Google LLC, a provider of electronic communications service and remote computing services headquartered at 1600 Amphitheatre Parkway in Mountain View, California. The information to be searched is described in the

following paragraphs and in Attachment A. This affidavit is made in support of an application for a warrant under 18 U.S.C. § 2703(c)(1)(A) to require Google LLC to disclose to the government the information further described in Attachment B. The government will then review that information and seize the information that is further described in Attachment B.

2. The purpose of this affidavit is to obtain information identifying any cellular devices that were within a limited geographic area of the Natural Bridge State Resort Park and the Daniel Boone National Forest near Slade, Kentucky, where, on April 17, 2023, the Natural Bridge Fire originated, to which, the United States Forest Service incurred over $700,000 towards suppression costs. As of September 17, 2023, the fire burned approximately 125 acres. The fire is being investigated for possible violations of 18 U.S.C. § 1855, willfully setting or causing a fire upon lands owned by the United States; and 18 U.S.C. § 1856, failing to extinguish a fire upon lands owned by the United States.

3. I am a duly sworn Federal Law Enforcement Officer with the United States Forest Service (USFS) since January 2021. I have previously worked for the National Park Service as a Law Enforcement Ranger for approximately 2 years. I received formalized training at the Federal Law Enforcement Training Center in Brunswick Georgia for four months in 2021. I also have received formalized training at the Santa Rosa Public Safety Training Center during the Seasonal Law Enforcement Training Program for four months in 2017. I previously worked as a wildland firefighter for Texas State Parks, performing prescribed fire/controlled burns for four months in 2017/2018. I have previously worked as a wildland fire dispatcher for the US Forest Service for four months in 2020. I am a fully qualified wildland fire investigator, having completed the following courses: Fire Investigation 110 - Wildland Fire Observations and Origin Scene Protection for First Responders; and Fire Investigation 210 - Wildland Fire Origin and

Cause Investigation. I have also completed the following wildland firefighting courses: S-110 Basic Wildland Fire Orientation; S-190 Introduction to Wildland Fire Behavior; S-130 Firefighter Training; S-133 Look Up, Look Down, Look Around; S-134 LCES; and L-180 Human Factors in the Wildland Fire Service. I attended an "Introduction to Communication Technology" course through the Western Regional Counterdrug Training Center outlining cellphone communication architecture, cellphone geolocation, IP address, online communication, and strategies and tips in analyzing communications.

4. During these training courses, I received training in the professional standards of wildland fire investigation, fire behavior, identifying and recognizing burn patterns, identifying, and collecting fire scene evidence, investigation methodology, interviewing, search warrant development, and courtroom preparation and testimony. During the course of my employment, I have been the lead investigator and conducted fire investigations for at least twenty-six fire related incidents while working on the Daniel Boone National Forest. I have assisted other experienced fire investigators and have drawn from their knowledge and expertise in at least seven other complex fire investigations. I have testified in court, conducted searches of records, executed arrest warrants, and executed search warrants. I have previously filed a subpoena for subscriber information of a cellular telecommunication device with the National Park Service. I have investigated violations of federal criminal law under Title 36 of the Code of Federal Regulations, Title 18 of U.S. Code, Title 21 of U.S. Code, and Title 16 of U.S. Code. This includes cases that involve conducting investigations of, and to initiate arrests for, various offenses involving National Forest lands, National Park lands and government property, including offenses involving the damage or theft of government property. I have also

participated in various aspects of federal investigations, including interviewing defendants, witnesses, and cooperating sources.

5.      The information contained in this affidavit is based on my participation in this investigation, information provided to me by other law enforcement officers involved in this investigation, and my discussions with other law enforcement agents and witnesses. The information contained in this affidavit does not describe the entirety of this investigation but sets forth only those facts relevant and necessary to determining probable cause for the requested search.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1855 and 1856, as listed above, have been committed by an unknown person or persons. There is also probable cause to search the information described in Attachment A for evidence of these crimes, further described in Attachment B.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Eastern District of Kentucky is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO FIRE INVESTIGATION TECHNIQUES

8.      As a wildland fire spreads, it leaves behind fire effects on objects it contacts and passes by/through, these are known as fire pattern indicators. Fire pattern indicators are physical objects that display changes from exposure to heat, flame, and combustion byproducts. Analyzing fire pattern indicators helps fire investigators determine the origin of wildland fires

because accurate analysis of fire pattern indicators reveals the direction in which wildland fires spread. Additionally, wildland fire investigators can use fire pattern indicators to determine the location where wildland fires originally ignite through a process known as "backtracking", where the investigator identifies and follows fire pattern indicators to the area where the fire originated.

9. Upon locating the origin of a wildland fire, wildland fire investigators then determine the cause of the fire, using the scientific process to develop and test a hypothesis, ultimately formulating a final hypothesis based on empirical data collected during the investigation. According to the National Wildfire Coordinating Group (NWCG), PMS 412, Guide to Wildland Fire Origin and Cause Determination, which is incorporated in my training and experience, I know that there are nine fundamental categories of wildland fires. These categories are, in no particular order: lightning, campfires, smoking, debris burning, arson/incendiary, equipment use, railroads, children, and miscellaneous. The miscellaneous category includes several sub-categories of fire causes, some of which include, fireworks, firearms, powerlines, and welding.

10. To determine the cause of a wildland fire, fire investigators engage in a systematic examination of the fire's origin location and adjacent area. This analysis leads to the exclusion of causal categories for which no evidence exists. For example, if fire investigators do not find evidence of a campfire within the fire's general origin location or adjacent areas, then wildland fire investigators can logically exclude a campfire as the fire's cause. This systematic methodology, which requires a careful examination of a fire's origin location and adjacent area, eventually leads to fire investigators making a determination based on non-excluded causal categories. Typically, this determination occurs once fire investigators logically exclude all, but

one possible cause of the wildland fire based on evidence and empirical data recovered within the fire's origin location, adjacent area and throughout the course of the investigation.

## RELEVANT CELLULAR AND INTERNET TECHNOLOGY

11.     Based on my training and experience, I know that cellular devices, such as mobile telephone(s), are wireless devices that enable their users to send and receive wire and/or electronic communications using the networks provided by cellular service providers. Using cellular networks, users of many cellular devices can send and receive communications over the Internet.

12.     Based on my training and experience, I also know that many cellular devices such as mobile telephones have the capability to connect to wireless Internet ("Wi-Fi") access points if a user enables Wi-Fi connectivity. These devices can, in such cases, enable their users to send or receive wire and/or electronic communications via the Wi-Fi network. Wi-Fi access points, such as those created through the use of a router and offered in places such as homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the Wi-Fi network.  In general, devices with Wi-Fi capability routinely scan their environment to determine what Wi-Fi access points are within range and will display the names of networks within range under the device's Wi-Fi settings.

13.     Based on my training and experience, I also know that many cellular devices feature Bluetooth functionality.  Bluetooth allows for short-range wireless connections between devices, such as between a mobile device and Bluetooth-enabled headphones.  Bluetooth uses radio waves to allow the devices to exchange information.  When Bluetooth is enabled, a mobile device routinely scans its environment to identify Bluetooth devices, which emit beacons that

can be detected by mobile devices within the Bluetooth device's transmission range, to which it might connect.

14. Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology. Using this technology, the phone can determine its precise geographical coordinates. If permitted by the user, this information is often used by apps installed on a device as part of the app's operation.

15. Based on my training and experience, I know Google LLC. is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Nearly every cellular phone using the Android operating system has an associated Google LLC. account, and users are prompted to add a Google LLC. account when they first turn on a new Android device.

16. In addition, based on my training and experience, I know that Google LLC. offers numerous online-based services, including email (Gmail), navigation (Google LLC. Maps), search engine (Google LLC.), online file storage (including Google LLC. Drive, Google LLC. Photos, and YouTube), messaging (Google LLC. Hangouts and Google LLC. Allo), and video calling (Google LLC. Duo). Some services, such as Gmail, online file storage, and messaging, require the user to sign into the service using their Google LLC account. An individual can obtain a Google LLC account by registering with Google LLC, and the account identifier typically is in the form of a Gmail address. Other services, such as Google LLC Maps and YouTube, can be used while signed into a Google LLC account, although some aspects of these services can be used even without being signed into a Google LLC account.

17. In addition, based on my training and experience, I know Google LLC offers an Internet browser known as Chrome that can be used on both computers and mobile devices. A

7

user has the ability to sign into a Google LLC account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be synced across the various devices on which they may use the Chrome browsing software, although Chrome can also be used without signing into a Google LLC account. Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices.

18. Based on my training and experience, I know that, in the context of mobile devices, Google LLC's cloud-based services can be accessed either via the device's Internet browser or via apps offered by Google LLC that have been downloaded onto the device. Google LLC apps exist for, and can be downloaded to, phones that do not run the Android operating system, such as Apple devices.

19. Based on my training and experience, I know that Google LLC collects and retains location data from devices running the Android operating system when the user has enabled Google LLC "Location History"," which authorizes Google LLC when certain prerequisites are satisfied, to collect and retain a record of the locations where Google LLC calculated a device to be based on information transmitted to Google LLC by the device. Google LLC then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google LLC Maps is used, and to provide location-based advertising. In addition, I know that Google LLC collects and retains data from non-Android devices that run Google LLC apps if the user has enabled location sharing. Google LLC typically associates the collected location information with the Google LLC account associated with the Android device and/or that is signed in via the relevant Google LLC app. The location information collected by Google LLC is derived from sources including GPS data and information about Wi-Fi access points and Bluetooth beacons within range of the

mobile device. Google LLC uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data. Google LLC records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google LLC as a "maps display radius," for each latitude and longitude point. That Location History is stored on Google LLC servers, and it is associated with the Google LLC account that is associated with the device. Each account holder may view their Location History and may delete all or part of it at any time.

20. Based on open-source materials published by Google LLC and my training and experience, I know that Location History is not turned on by default. A Google LLC account holder must opt-in to Location History and must enable location reporting with respect to each specific device and application on which they use their Google LLC account in order for that usage to be recorded in Location History. A Google LLC account holder can also prevent additional Location History records from being created at any time by turning off the Location History setting for their Google LLC account or by disabling location reporting for a particular device or Google LLC application. When Location History is enabled, however, Google LLC collects and retains location data for each device with Location Services enabled, associates it with the relevant Google LLC account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google LLC Maps is used, and to provide location-based advertising. As noted above, the Google LLC account holder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google LLC account or by enabling auto-deletion of their Location History records older than a set number of months.

21. Location data, such as the location data in the possession of Google LLC can assist in a criminal investigation in various ways. As relevant here, I know based on my training and experience that Google LLC has the ability to determine, based on location data collected via the use of Google LLC products as described above, mobile devices that were in a particular geographic area during a particular time frame and to determine which Google LLC account(s) those devices are associated with. Among other things, this information can inculpate or exculpate a Google LLC account holder by showing that he was, or was not, near a given location at a time relevant to the criminal investigation.

22. Based on my training and experience, I know that when individuals register with Google LLC for an account, Google LLC asks subscribers to provide certain personal identifying information. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, the information often provide clues to their identity, location, or illicit activities.

23. Based on my training and experience, I also know that Google LLC typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's

website), and other log files that reflect usage of the account.  In addition, Google LLC often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

## STATEMENT OF PROBABLE CAUSE

24.     The United States Forest Service is currently investigating the Natural Bridge Fire, which occurred on April 17, 2023, sometime after 6:25 p.m. Eastern Standard Time.  The identified origin area of the Natural Bridge Fire is located in the Natural Bridge State Resort Park near Slade, in Powell County, Kentucky.  On April 18, 2023, the fire spread and burned onto land owned and administered by the USFS on the Daniel Boone National Forest.  Additionally, the area in question lies within the Eastern District of Kentucky.  Subsequently, the fire burned approximately 125 acres before being contained, with an estimated suppression cost of $701,545.00.  Approximately, 40 acres of USFS mixed timber burned as a result of the fire burning onto USFS property.  At the time of this affidavit, this crime is unsolved.  The investigation concerns possible violations of 18 U.S.C. § 1855, willfully setting or causing a fire upon lands owned by the United States; and 18 U.S.C. § 1856, failing to extinguish a fire upon lands owned by the United States.

25.     On April 22, 2023, I prepared an Origin and Cause determination pursuant to the NWCG PMS-412 Guide to Wildland Fire Origin and Cause.  The origin of the fire is the original ignition point where the Natural Bridge fire started and spread from.  I determined the origin was located in the area of the following Global Positioning System (GPS) coordinates: (37Deg

46Mins 25Sec, -83Deg 41Mins 0Sec).  The origin area was located on top of a cliff line ridge in between the Natural Bridge Ski Lift and the top of a geologic feature known as, Natural Bridge, and along a designated hiking trail.

26. Based on information identified during the investigation and observations made within the origin area, I was able to exclude eight of the nine categories of wildland fire causes in no particular order through lack of supporting evidence: lightning, campfires, smoking, debris burning, equipment use, railroads, children, and miscellaneous.

27. I was not able to exclude Arson/Incendiary as a possible cause of the Natural Bridge Fire.  The Guide to Wildland Fire Origin and Cause Determination handbook identifies the cause category of arson/incendiary as wildfires deliberately or maliciously set with the intent to damage or defraud. "NWCG Handbook", PMS 412, NFES 1874, Chapter 6, page 215, (2016). Arson is more specifically defined as the intentional and wrongful burning of someone else's property or one's own property (as to fraudulently collect insurance). (Garner, 2009) "NWCG Handbook", PMS 412, NFES 1874, Chapter 6, page 299, (2016).  Incendiary is more specifically defined as deliberately and unlawfully setting fire to property. (Garner, 2009) "NWCG Handbook", PMS 412, NFES 1874, Chapter 6, page 299, (2016).  These terms are often used interchangeably.

28. The investigation identified a witness, Natalie McKinley, who is a federal employee with the U.S. Army Corps of Engineers on official work travel to the Natural Bridge State Resort Park, who was in the area at the time of the fire.  During an interview with McKinley, she said she was hiking in the Natural Bridge State Park, near the identified origin area of the fire on April 17, 2023, and recorded her hike with a Strava workout application. McKinley also took photos during her hike, that were determined to be time stamped.

29.     The Strava application mapped her route of travel with locations and times where the various photos were taken during her hike, which assisted investigators with determining locations and times of her observations and travels. After reviewing the data from the Strava application, which McKinley provided, she began her hike at 6:24 p.m. and concluded in close proximity to the origin area of the fire, on top of Natural Bridge, where she did not observe any fire or smoke. During her hike, she observed a group of four to five younger male adults in their late teens to early twenties at the top of Natural Bridge around 6:53 p.m. According to McKinley, this group of male adults was walking towards the determined origin of the fire.

30.     After the completion of her hike, McKinley left the area around 6:57 p.m. and hiked back to the Natural Bridge State Resort Park Lodge. On her way to the lodge, around 7:16 to 7:23 p.m., she observed the same group of young male adults running down the Original Trail past her. The group appeared out of place, did not have traditional hiking clothes or equipment, and appeared out of breath as they were running away from the Natural Bridge geologic feature. Shortly after, she began smelling smoke.



*(Image depicts map of the Natural Bridge State Park and the locations where McKinley travelled, as well as the estimated locations where she observed the male adults.)*

31. The area the group was seen running towards does not have any local residences or neighborhoods and is rather rural. There is a two-lane highway, KY-11, which is the primary road for the area, and is the access route to or from the Natural Bridge State Resort Park. Based on my training and experience, people who commit crimes, intentionally or unintentionally, normally want to distance themselves from the area, oftentimes by running away on foot. Individuals who may have seen the fire and ran to safety would more than likely have called the authorities. The area on top of Natural Bridge State Park also has consistent cell phone service for both Verizon and ATT where individuals would very likely have coverage to dial 911 and report a fire.

32. The investigation revealed information from the initial 911 reports called in at approximately 8:39 p.m. The first report to Powell County Dispatch was approximately one hour and sixteen minutes after the group of males was last seen running from the origin area. The initial call was from a female former employee of Natural Bridge State Park who saw the fire

and reported it to Hemlock Lodge. At the time of the first report, the fire was visible from KY-11 and the lower parking lots as verified by a Natural Bridge State Park employee.

33. Based on all the above factors I believe that the individuals who were observed running away from an area where a fire started, may be responsible for, or have information about who started the fire. Based on my training, experience, the evidence obtained during the investigation, and witness interviews, the Natural Bridge Fire was a result of human activity by an unknown person(s) which occurred within the geofence perimeter identified in Attachment A, on April 17, 2023, between the hours of 6:50 p.m. and 7:25 p.m.

34. Therefore, I believe that a Google LLC. "geofence" warrant, for the area of Natural Bridge within Natural Bridge State Resort Park and surrounding Daniel Boone National Forest would help to conclusively identify the person or persons responsible for setting timber alight. This area is in an isolated rural tourist community with minimal visitation on non-weekend days. The "geofence" warrant would capture the area of Natural Bridge State Resort Park (as more fully described in Attachment A).

35. Based on my training and experience in the investigation of violations of federal criminal laws, to include wildland fire origin and cause investigations, I have found that almost universally, individuals are in possession of cellular telephones both in daily life and before, during, and after the commission of crimes. As the United States Supreme Court articulated in Carpenter, "cell phones and the services they provide are such a pervasive and insistent part of daily life that carrying one is indispensable to participation in modern society." *Carpenter v. United States,* 138 S. Ct. 2206, 2220, (2018) (internal citation and quotation omitted).

36. Furthermore, Your Affiant has found through training and experience that those involved in the commission of arson, as well as other illicit and criminal activity, will utilize

15

cellular phones to contact other alleged co-conspirators for the purpose of furthering criminal activity. Additionally, these individuals will often research targets and their locations, and other information related to the offense using cellular devices, often at or near the time of the offense.

37. Based upon the aforementioned information, it is believed that the records requested in "Attachment A", are relevant and material to the ongoing criminal investigation of unknown person(s) for violations of 18 U.S.C. § 1855 – Timber set afire, and 18 U.S.C. § 1856, failing to extinguish a fire.

38. Based on the foregoing, Your Affiant submits there is probable cause to search information that is currently in the possession of Google LLC and that relates to devices within the location described in Attachment A during the time period described in Attachment A for evidence of the crime(s) under investigation. The information to be searched includes (1) identifiers of each device; (2) the location(s) reported by each device to Google LLC and the associated timestamp; and (3) basic subscriber information for the Google LLC account(s) associated with each device.

39. The proposed warrant sets forth a multi-step process whereby the government will obtain the information described above. Specifically, as described in Attachment B:

    a. Using Location History data, Google LLC will identify those devices that it calculated were or could have been (based on the associated margin of error for the estimated latitude/longitude point) within the Target Location described in Attachment A during the time period described in Attachment A. For each device, Google LLC will provide a unique device ID assigned by Google LLC and its location coordinates along with the associated timestamp(s), margin(s) of error for the coordinates (i.e., "maps

display radius"), and source(s) from which the location data was derived (e.g., GPS, wi-fi, Bluetooth), if available. Google LLC will not, in this step, provide the Google LLC account identifiers (e.g., example@gmail.com) associated with the devices or basic subscriber information for those accounts to the government.

b. The government will identify to Google LLC the devices appearing on the list produced in step 1 for which it seeks the Google LLC account identifier and basic subscriber information. The government may, at its discretion, identify a subset of the devices.

c. Google LLC will then disclose to the government the Google LLC account identifier associated with the devices identified by the government, along with basic subscriber information for those accounts.

40. This application is a minimal invasion of privacy and does not seek the contents of any communications or cellular devices.

41. This process furthers efficiency and privacy by allowing for the possibility that the government, upon reviewing contextual information for all devices identified by Google LLC may be able to determine that one or more devices associated with a Google LLC account (and the associated basic subscriber information) are likely to be of heightened evidentiary value and warrant further investigation before the records of other accounts in use in the area are disclosed to the government.

## CONCLUSION

42. I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c).

43.     I further request that the Court direct Google LLC to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on Google LLC who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

44.     I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

/s/ Kyle McCammon
Kyle McCammon, Law Enforcement Officer
United States Forest Service
Law Enforcement and Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __Telephone_____ (specify reliable electronic means) on this 19th day of January, 2024.

**Matthew A. Stinnett, U.S. Magistrate Judge**

18